MARGARET HAMMOND, ADMINISTRATRIX *AD PROSE-QUENDUM, ETC., ET ALS.*, PLAINTIFFS-APPELLANTS, v. THE PENNSYLVANIA RAILROAD CO., NEW YORK & LONG BRANCH RAILROAD CO., AND P. S. WENTZ, DEFENDANTS-RESPONDENTS.

Argued October 14, 1959—Decided December 21, 1959.

Mr. *Eugene Capibianco* argued the cause for plaintiffs-appellants.

Mr. *Stephen A. Argeris* argued the cause for defendant-respondent, New York and Long Branch Railroad Company (*Messrs. Hanlon, Argeris & Crahay,* attorneys; *Messrs. Wm. F. Hanlon and Stephen A. Argeris,* of counsel).

The opinion of the court was delivered by

WEINTRAUB, C. J. The single question presented is whether illegitimate children are "children" within the meaning of the Federal Employers' Liability Act, 45 *U. S. C. A.* § 51. Upon motion the complaint was dismissed. We certified the appeal before the Appellate Division acted upon it.

The complaint alleged the deceased John Hammond was survived by his five children, all under the age of 21 years, who "were dependent upon the said John Hammond for support, maintenance, nurture and education, all of which have been lost by his death." The federal statute provides that an employer railroad shall be liable in damages for negligence in the case of the death of an employee "for the benefit of the surviving widow or husband and children of such employee; and, if none * * * then the next of kin dependent upon such employee." Illegitimacy of the infants was conceded.

Defendant urges that who are "children" must be determined by state law. In *Seaboard Air Line Railway v. Kenney*, 240 *U. S.* 489, 36 *S. Ct.* 458, 60 *L. Ed.* 762 (1916), the court, faced with the question whether "next of kin" in this statute (1) required the uniform application of its common-law meaning or (2) embraced current definitions of the term under the law of the state concerned, accepted the latter proposition. This view was reaffirmed in *Poff v. Pennsylvania Railroad Co.*, 327 *U. S.* 399, 66 *S. Ct.* 603, 90 *L. Ed.* 749 (1946). The holding would seem to apply with equal force to "widow" and "husband," since these terms, like "next of kin," involve a status ascertainable only by reference to some rule of law. And the New York Court of Appeals construed *Seaboard* to require the same approach to "children." *Hiser v. Davis*, 234 *N. Y.* 300, 137 *N. E.* 596 (*Ct. App.* 1922).

But plaintiffs argue that "children" may readily be identified on the basis of physical relationship. Hence, there being no need to look to state law, it is urged the word should receive an interpretation which will fully satisfy the con-

gressional purpose to compensate the dependent for financial loss caused by a defendant's wrong. Reliance is placed upon *Middleton v. Luckenbach S. S. Co., Inc.*, 70 *F. 2d* 326, 328 (2 *Cir.* 1934), *certiorari* denied 293 *U. S.* 577, 55 *S. Ct.* 89, 79 *L. Ed.* 674 (1934). There the action was brought under the Death on High Seas Act, 46 *U. S. C. A.* § 761, which provides for recovery "for the exclusive benefit of the decedent's wife, husband, parent, child, or dependent relative." The court found *Seaboard* to be inapplicable. It stressed that whereas in *Seaboard* "the transaction had a substantial contact with the state" as the place of accident and suit, here "the occurrence must be on the high seas, and the federal law obtains as the law of the place where the wrong occurred." It also emphasized that unlike the Federal Employers' Liability Act the statute before it does not use the expression "next of kin," an expression which depends upon some legislative definition, but rather employs words which the judiciary can itself construe. The court held "children" to mean children in fact, whether or not legitimate under state law, a result it found consonant with the purpose of Congress to compensate for deprivation of support, saying (70 *F. 2d,* at *page* 329):

"There is no right of inheritance involved here. It is a statute that confers recovery upon dependents, not for the benefit of an estate, but for those who by our standards are legally or morally entitled to support. Humane considerations and the realization that children are such no matter what their origin alone might compel us to the construction that, under present day conditions, our social attitude warrants a construction different from that of the early English view. The purpose and object of the statute is to continue the support of dependents after a casualty. To hold that these children or the parents do not come within the terms of the act would be to defeat the purposes of the act. The benefit conferred beyond being for such beneficiaries is for society's welfare in making provision for the support of those who might otherwise become dependent. The rule that a bastard is nullius filius applies only in cases of inheritance. Even in that situation we have made very considerable advances toward giving illegitimates the right of capacity to inherit by admitting them to possess inheritable blood. 2 Kent's Commentaries (12th Ed.) 215."

Thus in *Middleton* the court found *Seaboard* to be inapplicable, not upon the ground that the thesis of *Seaboard* would not apply to "children" under the Federal Employers' Liability Act, but rather because of differences in language in the statutes and in the identification of the tort law which applies to the cause of action. On the other hand, the observations expressed in the quotation above could be brought to bear with equal force upon a claim under the Federal Employers' Liability Act, for that statute too is not one of inheritance and has the same purpose of affording a remedy to a child for the pecuniary loss it suffered. *Gulf, Colorado & Sante Fe Railway Co. v. McGinnis,* 228 *U. S.* 173, 33 *S. Ct.* 426, 57 *L. Ed.* 785 (1913).

*Civil v. Waterman Steamship Corp.,* 217 *F.* 2d 94 (2 *Cir.* 1954), involved an action under both the Death on High Seas Act and the Jones Act, 46 *U. S. C.* § 688, 46 *U. S. C. A.* § 688. The right of illegitimate children to recover under the Death on High Seas Act was upheld in *Middleton,* which *Civil* cited and followed. The court added however, by *dictum,* that illegitimate children also qualify as beneficiaries under the Jones Act. The Jones Act provides that in the case of a seaman's death, the personal representative may maintain an action in which "all statutes of the United States conferring or regulating the right of action for death in the case of railway employees shall be applicable." The reference accordingly is to the Federal Employers' Liability Act. On the other hand, in *De Sylva v. Ballentine,* 351 *U. S.* 570, 581, 76 *S. Ct.* 974, 100 *L. Ed.* 1415 (1956), rehearing denied 352 *U. S.* 859, 77 *S. Ct.* 22, 1 *L. Ed.* 2d 69 (1956), the majority opinion cited *Seaboard* in a fashion which may indicate "children" in that statute calls for a reference to state law.

In the light of the foregoing we cannot say with confidence that "children" here was intended by Congress to refer solely to a physical relationship without regard to any impact on the local policies of the several states. For the reason about to be stated, we need not decide the .question, for, if we

assume a reference to state law was intended, the infants nonetheless are entitled to prevail.

*Seaboard* found Congress intended a reference to state law for the purpose of avoiding disruption of local domestic policy. This is implicit in the court's explanation of why it would not accord to "next of kin" a single meaning, to wit, the common-law signification of the term (240 *U. S.,* at *page* 494, 36 *S. Ct.,* at *page* 460):

"* * * Leaving aside the misapplication of the rule of construction relied upon, it is obvious that the contention amounts to saying that Congress, by the mere statement of a class, that is, next of kin, without defining whom the class embraces, must be assumed to have overthrown the local law of the states, and substituted another law for it; when conceding that there was power in Congress to do so, it is clear that no such extreme result could possibly be attributed to the act of Congress without express and unambiguous provisions rendering such conclusion necessary. The truth of this view will be made at once additionally apparent by considering the far-reaching consequence of the proposition, since, if it be well founded, it would apply equally to the other requirements of the statute,—to the provisions as to the surviving widow, the husband and children, and to parents, thus, for the purposes of the enforcement of the act, overthrowing the legislation of the states on subjects of the most intimate domestic character, and substituting for it the common law as stereotyped at the time of the separation. The argument that such result must have been intended, since it is to be assumed that Congress contemplated uniformity, that is, that the next of kin entitled to take under the statute should be uniformly applied in all the states, after all comes to saying that it must be assumed that Congress intended to create a uniformity on one subject by producing discord and want of uniformity as to many others."

The same thesis seems evident in *De Sylva v. Ballentine, supra* (351 *U. S.* 570, 76 *S. Ct.* 974, 100 *L. Ed.* 1415). Section 24 of the Copyright Act, 17 *U. S. C.* § 1 *et seq.,* provides for renewal of a copyright upon the application of the widow or "children" of the deceased author. An illegitimate child was held to be within the act. Two justices, concurring in that result, felt "the statutory policy of protecting dependents would be better served by uniformity" and found "children" to include the illegitimate offspring.

The majority, however, concluded Congress intended a reference to state law, emphasizing that "there is no federal law of domestic relations, which is primarily a matter of state concern." "This does not mean that a State would be entitled to use the word 'children' in a way entirely strange to those familiar with its ordinary usage, but at least to the extent that there are permissible variations in the ordinary concept of 'children' we deem state law controlling." The majority then addressed itself to the question, "what part of that State's law defines the relationship," since the child was not shown to have been legitimated under state law for all purposes. The majority selected that part of the state law which was relevant to "the purposes of § 24 of the Copyright Act." It concluded that since § 24 "takes the form of a compulsory bequest of the copyright to the designated persons," the question is one "of the descent of property, and we think the controlling question under state law should be whether the child would be an heir of the author." The majority found the illegitimate child was an heir under the state law.

 From the foregoing, these conclusions appear correct:

(1) Congress did not ordain that the illegitimate offspring shall be denied the benefit of the Federal Employers' Liability Act. On the contrary, Congress was agreeable that "children" include him to further its objective that dependents be compensated.

(2) Congress deferred to the states for the purpose of avoiding conflict with local policy. Hence illegitimate children should be protected unless to do so will offend our state policy.

(3) The question before us is not what "children" would mean in a statute adopted by our Legislature. It is a federal act we are to apply. And the issue of compatibility with State policy calls for a judicial determination upon a reference to that part of the state law which relates to the subject matter of the federal act.

 At common law a bastard was said to be the child of nobody (*nullius filius*). The biological myth was invented to achieve a result. The sweep of fictions should be contained by the reason for their invention. *Michaels v. Brookchester, Inc.*, 26 N. J. 379, 385 (1958). Blackstone in his *Commentaries, Vol.* 1, *p.* 459, described the consequences of the concept in these words:

"\* \* \* The incapacity of a bastard consists principally in this, that he cannot be heir to anyone, neither can he have heirs, but of his own body; for, being *nullius filius*, he is therefore of kin to nobody, and has no ancestor from whom any inheritable blood can be derived. A bastard was also, in strictness, incapable of holy orders; and, though that were dispensed with, yet he was utterly disqualified from holding any dignity in the church: but this doctrine seems now obsolete; and, in all other respects, there is no distinction between a bastard and another man. And really any other distinction, but that of not inheriting, which civil policy renders necessary, would, with regard to the innocent offspring of his parents' crimes, be odious, unjust, and cruel to the last degree \* \* \*. A bastard may, lastly, be made legitimate, and capable of inheriting, by the transcendent power of an act of parliament, and not otherwise \* \* \*."

Kent expressed essentially the same view in his *Commentaries, Vol.* 2, *p.* 214:

"\* \* \* The rule that a bastard is *nullius filius*, applies only to the case of inheritances. It has been held to be unlawful for him to marry within the levitical degrees, and a bastard has been considered to be within the marriage act of 26 Geo. II., which required the consent of the father, guardian, or mother, to the validity of the marriage of a minor. He also takes and follows the settlement of his mother. With the exception of the right of inheritance and succession, bastards, by the English law, as well as by the laws of France, Spain, and Italy, are put upon an equal footing with their fellow subjects; and in this country we have made very considerable advances towards giving them also the capacity to inherit, by admitting them to possess inheritable blood. We have, in this respect, followed the spirit of the laws of some of the ancient nations, who denied to bastards an equal share of their father's estate, (for that would be giving too much countenance to the indulgence of criminal desire,) but admitted them to a certain portion, and would not suffer them to be cast naked and destitute upon the world."

See also *State v. Chavez,* 42 *N. M.* 569, 82 *P. 2d* 900 *(Sup. Ct.*
1938) ; 27 *Am. Jur., Incest,* § 3, *p.* 289; *Ciarlo v. New
York City,* 270 *App. Div.* 594, 61 *N. Y. S. 2d* 751 *(App.
Div.* 1946), affirmed, 296 *N. Y.* 962, 73 *N. E. 2d* 269 *(Ct.
App.* 1947), in which a statute dealing with pension benefits
for "dependents," payable to "child or children" if there be
no "widow," was held to protect an illegitimate child; 15
*Fordham L. Rev.* 282 (1946) ; but see *Coyle v. Pension
Commission,* 108 *N. J. L.* 1 *(Sup. Ct.* 1931).

Hence it is clear that at common law a bastard was not
*nullius filius* for all purposes. Nor has our Legislature so
denounced him. Even with respect to inheritance, the Legis-
lature almost a century ago permitted the illegitimate child
to inherit from the mother. *Voorhees v. Sharp,* 63 *N. J. Eq.*
216 *(Prerog.* 1901). Today an illegitimate child is treated
the same as if the legitimate child of the mother, entitling
him to take also from his maternal kindred including an-
cestors, descendants and collaterals, and if his parents marry
after his birth and recognize and treat him as their child,
he is deemed to have been their legitimate child for the
purpose of descent and distribution. *N. J. S.* 3A :4–7 ;
see also *R. S.* 9 :15–1. We need not consider the extent to
which the fiction may have intruded into areas alien to the
one for which it was created, for with respect to the matter
here pertinent, to wit, support, the biological truth has long
prevailed in this State. An act for the maintenance of
bastard children, adopted February 26, 1795 *(Paterson's
Laws of New Jersey, p.* 152) charged both the mother and
reputed father with the support of the child. The English
law so charged the putative father at the time of the separa-
tion of the Colonies. See *Borawick v. Barba,* 7 *N. J.* 393
(1951) ; 1 *Blackstone, Commentaries,* 458. Under our pres-
ent statutes, welfare representatives may press an action
against the father if the child is or is likely to become charge-
able to the municipality. *N. J. S. A.* 9 :17–1 *et seq.* Further,
and wholly apart from possible impact upon the relief rolls,
*R. S.* 9 :16–2 provides broadly :

"A child born out of wedlock shall be entitled to support and education from its father and mother to the same extent as if born in lawful wedlock."

*N. J. S. A.* 9:16–3 authorizes proceedings to enforce that obligation for the benefit of the child. *Kopak v. Polzer,* 4 *N. J.* 327, 331 (1950); *Hall v. Centolanza,* 28 *N. J. Super.* 391 (*App. Div.* 1953). Specifically pertinent is the fact that in dealing with the very area embraced in the Federal Employers' Liability Act, to wit, compensation for industrial death, the Legislature expressly included "illegitimate children" within the category of "dependents" entitled to benefit. *N. J. S. A.* 34:15–13; *Morgan v. Susino Construction Co.,* 130 *N. J. L.* 418 (*Sup. Ct.* 1943), affirmed 131 *N. J. L.* 329 (*E. & A.* 1944).

██ Whatever policy considerations may still support the rules relating to inheritance by illegitimate children from their natural father, they do not obtain in the critical area of support and wrongful deprivation of it by industrial death. Enforcement of the congressional purpose to compensate dependents by including illegitimate children therein will not disturb our domestic scene. On the contrary, it will further the policy of our statutes for the benefit of the infants themselves as well as for the protection of public funds.

Since the matter must be remanded for further proceedings, we should comment upon a feature not discussed in the appeal. The action was brought by the widow as personal representative. Thereafter the infants were permitted to intervene and proceed by a next friend. Presumably that course was adopted because of hostility between the widow and the children. See *Civil, supra* (217 *F. 2d,* at *page* 98). The action should be brought by the personal representative, and a representative unwilling to act under a practical arrangement which will insure the fair presentation of the claims of all interests should be replaced by another. We were informed at argument that after the dismissal of the infants' complaint the action proceeded in the widow's interest with a judgment in favor of defendant. The impact,

if any, of that judgment upon the infants is not before us. For the purpose of further proceedings, appropriate steps should be taken to substitute a personal representative as plaintiff.

The judgment is reversed.

*For reversal*—Chief Justice WEINTRAUB, and Justices BURLING, JACOBS, FRANCIS, PROCTOR, HALL and SCHETTINO—7.

*For affirmance*—None.